IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Devon Moser,                            :        Case No. 1:02-cv-302
                                        :
            Plaintiff,                  :        District Judge Susan J. Dlott
      v.                                :        Magistrate Judge Timothy Black
                                        :
United States of America and John Does, :        ORDER GRANTING UNITED
                                        :        STATES' MOTION TO DISMISS FOR
            Defendants.                 :        LACK OF SUBJECT MATTER
                                        :        JURISDICTION AND DISMISSING
                                        :        AND CLOSING CASE


      This matter comes before the Court on Defendant United States' Motion to Dismiss for

Lack of Subject Matter Jurisdiction (doc. #48).[1]  For the reasons below, the United States'

Motion (doc. #48) is **GRANTED** and Plaintiff's case is **DISMISSED WITHOUT**

**PREJUDICE** to all claims and parties.

I.    **BACKGROUND**

      Plaintiff Devon Moser ("Moser") sued the United States Navy Balboa Medical Center[2]

("Balboa") in San Diego, California and Russell Morgan, M.D. ("Morgan") under the Federal

Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 *et seq*., contending she has suffered permanent

---

[1] The United States' motion is also brought, in the alternative, as a Rule 56 summary
judgment motion.  (See doc. #48 at 1.)  Because the Court may consider submitted evidence
relevant to the jurisdictional question under Rule 12(b)(1), see infra Part II, the Court need not
consider the United States' alternative Rule 56 grounds.

[2] Moser also names "John Doe" defendants, originally described as the "employees who
hired [Morgan] and negligently set up and maintained the military healthcare system" but more
broadly described in her first amended complaint as "anyone who is found to be additionally
liable and capable of suit through the process of discovery with the named defendant."  (See doc.
#1 (original complaint) at 1-2 and doc. #29 (first amended complaint ("FAC")) at 2 ¶ 4.)

disability and distress as a result of Morgan's failure to properly diagnose and treat a fracture in her right wrist.  (See generally doc. #1.)  Defendant United States, substituted for Balboa in Moser's first amended complaint,[3] now moves to dismiss Moser's claims on the grounds that this Court lacks subject matter jurisdiction to entertain them under the FTCA.  (Doc. #48.)

### A.    Factual Background

### 1.    Moser's Injury

On August 31, 1996, Moser injured her right wrist in a fall.  (Doc. #29 at 3 ¶ 12; doc. #36 at 3 ¶ 12.)  Moser was then married to a Navy SEAL stationed at the Balboa base in San Diego, California, and as such was eligible for medical benefits under the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS").  (Doc. #29 at 2 ¶ 6; doc. #36 at 2 ¶ 6; doc. #48 at 2.)  Moser avers that within a few hours of her injury, she and her husband sought treatment at Balboa's on-base emergency room, where a nurse set Moser's wrist in a "makeshift splint because they were out of right hand splints."  (Doc. #29 at 3 ¶¶ 11, 13-14; see also doc. #36 at 3 ¶ 13.)  Moser's wrist was X-rayed and Moser and the X-rays were then examined by Russell Morgan, M.D.[4] ("Morgan").  (Doc. #29 at 3-4 ¶¶ 14-15; doc. #36 at 4 ¶ 15.)

According to Moser, Morgan examined her in an "antagonistic and unprofessional manner," expressing "surprise upon looking at the X-ray and seeing no break," commenting on "how badly [Moser's] forearm looked due to swelling and bruising," and discarding – without replacing – Moser's splint so that she left Balboa with her wrist unsecured.  (Doc. #29 at 4 ¶ 16.)

_____

[3] In the FAC, Moser dismissed her claims against Morgan "with the understanding that naming him is not required to move forward with this FTCA complaint."  (Doc. #29 at 1.)

[4] The United States contends that a radiologist also reviewed the X-rays and determined that they "revealed no fracture or dislocation in [Moser's] wrist."  (Doc. #36 at ¶ 15.)

She recalls that Morgan advised her to return to Balboa in seven to ten days if her wrist was still bothering her, but also suggested that it shouldn't be necessary for her to return because her wrist was not broken, there was little more he could do for her, and she would be wasting his time. (Id. at 4 ¶ 17.)

Moser now contends that Morgan's "harsh words and antagonistic demeanor" during her August 31, 1996 visit to Balboa, as well as her own "past experiences with military hospitals" and knowledge of other incidents of "negligence and abuse" at Balboa and in the military healthcare system generally, discouraged her from returning to Balboa for timely follow-up despite residual pain in her wrist. (Id. at 4 ¶¶ 18-19, 5 ¶ 21.) She recalls that her husband attempted to self-treat what they perceived to be – "based on Dr. Morgan's assertions" – a soft tissue injury by wrapping her wrist with an Ace bandage. (Id. at 5 ¶ 20.) Nonetheless, according to Morgan, her right wrist never entirely healed. (Id. at 5 ¶ 21.) Moser complained to her chiropractor and OB/GYN about continuing wrist pain, see id. at 5 ¶ 22 and doc. #36 at 4 ¶ 22, but avers that she did not receive adequate treatment and eventually concluded, on the basis of Morgan's assertions at her examination and her own research, that she was experiencing arthritis pain "as a result of the injury weakening the joint." (Doc. #29 at 4 ¶ 22.)

Moser fell on her wrist again in December 1998, "slightly aggravat[ing] the existing pain," and returned to Balboa for more treatment. (Id. at 5 ¶ 23; see also doc. #36 at 5 ¶ 23.) New x-rays were taken, revealing what the United States describes as a "chronic right scaphoid non-union at the distal pole. (Doc. #36 at 5 ¶ 24; see also doc. #29 at 5 ¶ 24.) Moser contends that the injury identified in the new December 1998 x-rays is an "aged non-union" dating back to an unhealed hairline fracture she sustained in her August 31, 1996 fall. (Doc. #29 at 5-6 ¶ 24.)

3

She does not expressly contend that the fracture appeared in her August 31, 1996 x-rays.  Rather, she suggests that because she exhibited symptoms consistent with a hairline fracture and it was "practitioners' unique knowledge . . . never shared with [Moser], that hairline fractures do not show up immediately on x-rays when there is substantial swelling of the surrounding tissues at least 2-4% of the time," Morgan and others at Balboa should have anticipated a fracture and followed up with her regarding further diagnosis and treatment.  (Id. at 6 ¶ 25.)  Moser avers that despite surgery to implant a metal screw in her right scaphoid bone and ongoing specialized chiropractic care, she experiences chronic and intense wrist pain, stiffness and weakness; audible popping sounds on wrist flexion; and "mental and physical aggravation."  (Id. at 6 ¶¶ 26-27.)

### 2. Relationship between the Balboa Medical Facility and Dr. Morgan

At the time Morgan treated Moser, there were at least three contracts governing the professional relationship between Morgan and Balboa.[5]  (See doc. #48-1 at 2-6.)  The first was a "Resource Sharing Agreement" between Balboa and Foundation Health Federal Services, Inc. ("Foundation"), pursuant to which Foundation would provide "health care personnel, supplies, and equipment" to support Balboa's provision of health care services to CHAMPUS beneficiaries.  (See doc. #48, Ex. 1 at 1 ¶ 1.1, 2 ¶¶ 1.3, 2.1.)  The second was a "Resource Sharing Contract" between Foundation and Joseph H. Gatewood, M.D., Ltd. ("Gatewood"), pursuant to which Gatewood would furnish medical practitioners, including physicians, to support Foundation's provision of medical services to Balboa's CHAMPUS beneficiaries.  (See

_____

[5] The United States submitted copies of all three contracts as exhibits to its opening memorandum.  (See doc. #48 Exs. A-C.)  Moser does not appear to dispute that these three contracts existed and were in effect at the time Morgan examined her wrist, although she clearly disputes the legal effect of those contracts for the purposes of this case.  (See doc. #51 at 6-7.)

generally doc. #48, Ex 2 and Attachment A to Ex. 2.)  The third was an "Independent Contractor Physician Agreement" between Gatewood and Morgan, pursuant to which Morgan would provide sixteen hours a week of primary care services to Balboa patients.  (See generally doc. #48, Ex. 3.)

### B.     Procedural Background[6]

On May 13, 1999, Moser filed an administrative "Form 95" Claim for Damage, Injury, or Death with the Naval Legal Services Office for the Southwest United States.[7]  (See doc. #29 at 6-7 ¶ 28 and Doc. #48 Ex. 6 (copy of claim form); see also doc. #36 at 5-6 ¶ 28.)  On the form and an attachment, Moser described her claim as a "personal injury" claim "aris[ing] out of the failure of the Balboa Naval Medical Facility to properly diagnose and treat a fracture in my right wrist on 31 August 1996."  (Doc. #48 Ex. 6 at 2.)  She complained that the fracture had caused her "excessive pain for over two years," "temporary or permanent loss of ability in the limb," and "emotive distress due to verbal treatment by medical personnel at the time of the injury." (Id. at 1.)  The Navy then sent Moser's counsel a letter, dated May 24, 1999, requesting more information on her claim.  (See generally doc. #48 Ex. 7.)  The letter also stated:

> Please be advised that the United States may not be liable, under the Federal Tort
> Claims Act, for any contractors at the government facility.  While we will
> endeavor to identify any contractors who treated your client at the Naval Medical

---

[6] The Court summarizes only the procedural history relevant to the present motion.

[7] Moser further contends that she submitted a second Form 95 directly to Balboa in August 1999.  (Doc. #29 at 6-7 ¶ 28.)  She does not further describe this form, and neither she nor the United States has submitted a copy to the Court.  It is unclear whether this form was a reference copy of her May 1999 "Form 95" claim to the Navy, an independent "Form 95" incorporating the same claim description as the May 1999 "Form 95," or an independent "Form 95" incorporating a different claim description.  Given the timing of the submission, however, the first and second scenarios seem more likely than the third.

> Station, this process may take a long time or may be incomplete, and it is
> incumbent upon you to determine the liability of any such potential defendant or
> non-party-at-fault and to bring the appropriate legal action within the applicable
> statutes of limitations.

(Id. at 2.)

On November 8, 2001, the Navy informed Moser, through a letter to her counsel, that it

had denied her administrative claim.  (See doc. #63 Ex. 1.)  In its denial letter, the Navy

reasoned that because it "did not receive the claim until May 13, 1999, more than two years after

the alleged incident," and because Moser "should have discovered any alleged negligence not

later than her September 16 and December 18, 1996 medical examinations," the claim was

barred by the 2-year statute of limitations set forth at 28 U.S.C. § 2401(b).  (Id.; see also note 21,

infra.)  The Navy further asserted that

> [T]he [United States] is not liable under the Federal Tort Claims Act for this
> incident because there was no negligence on the part of any government
> employee and that Act does not waive sovereign immunity for a claim against the
> United States resulting from personal injury caused by the acts or omissions of a
> contractor (non-employee of the Government.)  The evidence indicates that
> Russell Morgan, M.D., who treated Ms. Moser at the Primary Care Clinic on
> August 31, 1996, was contracted through Spectrum Health Care Resources . . . .
> You should evaluate and present any claim regarding such contractor's alleged
> negligence directly against the contractor within the applicable statute of
> limitations.

(Id. (internal citations omitted).)[8]

Moser now alleges that the Navy, in an effort to exhaust the statute of limitations on any

separate action she might have filed against Morgan, deliberately failed to return her and her

counsel's phone calls and intentionally deferred its denial of her claim and its release of

---

[8] The denial letter also stated that "[i]f you choose to file suit, it must be filed in the
appropriate U.S. District Court within six months of the date this letter was mailed."  (Id.)

information on Morgan's employment status.  (Doc. #29 at 6-7 ¶ 28.)  The United States denies

any allegations of intentional or bad-faith delay.  (Doc. #36 at 5-6 ¶ 28.)

Moser filed her original civil complaint in April 2002 and amended that complaint in

January 2004.  (Docs. ##s 1, 29.)  In her first amended complaint ("FAC"), Moser alleges that

she has been proximately injured by Defendants' negligent and/or bad-faith acts or omissions,

including their "negligent hiring, retention and/or supervision" and "intentional" or "negligent

infliction of emotional distress."  (Doc. #129 at 7-8 ¶¶ 30-34.)  She further alleges that

Defendants' acts or omissions are "tantamount to" a conspiracy which proximately injured her,

in that

> multiple persons within the [United States'] agencies [*sic*] and control conspired
> to effectively prevent judicial review of medical malpractice engaged in regularly
> in military facilities and in fact, to set up a system designed to fail to provide
> competent medical care to U.S. military members and their dependants [*sic*].

(<u>Id</u>. at 8 ¶ 35.)  Moser seeks $10,000,000 in compensatory damages for "pain and suffering for

the rest of her natural life," "past, current and future medical care for her right wrist," and "any

necessary future psychological counseling resulting from her deeply ingrained distrust of the

medical professional community and/or any unforseen effects of Defendants' acts and/or

omissions," as well as any other relief this Court deems proper.  (<u>Id</u>. at 8.)

The United States answered Moser's FAC in March 2004 (doc. #36) and filed its pending

Motion to Dismiss for Lack of Jurisdiction or in the alternative for Summary Judgment

("Motion") (doc. #48) in December 2005.[9]

---

[9] This is the second motion to dismiss for lack of jurisdiction filed in this case.  Original
defendant Balboa moved to dismiss Moser's claims in November 2003, contending that it was
erroneously named as the federal party defendant in lieu of the United States.  (Doc. #20.)  This
Court denied that motion as moot in March 2004, after Moser filed her FAC substituting the

## II.  STANDARD OF REVIEW AND BURDEN OF PROOF

Motions to dismiss for lack of subject matter jurisdiction are governed by Federal Rule

12(b)(1).  See Fed. R. Civ. P. 12(b)(1).  Plaintiffs bear the burden of proving subject matter

jurisdiction, which is open to challenge at any time.  Nichols v. Muskingum College, 318 F.3d

674, 677 (6th Cir. 2003) (internal citations omitted); Sims v. University of Cincinnati, 46 F. Supp.

2d 736, 737 (S.D. Ohio 1999).  Where a defendant asserts merely that a plaintiff's complaint

lacks, on its face, sufficient facts to establish jurisdiction, the Court must take all allegations in

that complaint as true in deciding a Rule 12(b)(1) motion.[10]  Nichols, 318 F.3d at 677; United

States v. Ritchie, 15 F.3d 592, 598 (6th Cir. 1994).  Where a defendant asserts more broadly that

no facts exist which *could* support jurisdiction, however, the Court "may consider evidence

outside the pleadings . . . and both parties are free to supplement the record with affidavits" and

any other evidence the Court deems appropriate.  Nichols, 318 F.3d at 677; Gould v. Kuhlmann,

853 F.2d 445, 451 (6th Cir. 1988); Land v. Dollar, 330 U.S. 731, 734 n. 4 (1947).  Rule 12(b)(1)

factual disputes must be resolved "in a manner that is fair to the non-moving party," and the

preclusive effect of any factual findings is limited to the jurisdictional issue.  Rogers v. Stratton

Indus., 798 F.2d 913, 918 (6th Cir. 1986); Ritchie, 15 F.3d at 598.

## III.  ANALYSIS

The United States contends that this Court cannot entertain Moser's claims because the

_____

United States for Balboa.  (Doc. #37.)

[10]Actual dismissal is discouraged wherever it appears that facts exist which could support
federal subject matter jurisdiction, and that any defect in a complaint's jurisdictional allegations
could therefore be cured by amendment.  See, e.g., American Fed. of Gov't. Employees v. Stone,
No. 3:03-cv-355, 2005 WL 1620402, at *5 (S.D. Ohio July 6, 2005).

FTCA – Moser's only asserted basis for federal subject matter jurisdiction – does not waive the United States' sovereign immunity to private tort suits in cases alleging negligence by independent contractors.  (Doc. #48 at 1.)  It submits that Morgan was acting as a third-party private contractor when he examined Moser's wrist at Balboa in August 1996, and that the United States is therefore not liable for any potential malpractice of Morgan's.  (Id.)

In her opposition, Moser appears to concede that under the FTCA, the United States is liable only for the torts of its own employees.  (Doc. #51 at 1.)  She asserts, however, that Morgan acted as a federal employee during her wrist examination and that the United States has not met its burden of showing that any potentially culpable "John Doe" defendants were *not* federal employees at all relevant times.  (Id.)  In the alternative, she contends that the United States should be equitably estopped from contesting Morgan's employment status in the circumstances of this case.  (Id.)

Moser's opposition also advances several alternative FTCA claims relating to her wrist injury.  Moser suggests the United States is liable not only for Morgan's alleged malpractice during her August 31, 1996 wrist exam, but also for its own negligence in hiring and retaining Morgan and any other culpable medical personnel at Balboa.  (Id. at 2.)  Specifically, she contends that the United States is also liable for the Balboa emergency room staff's alleged failure to immobilize her wrist because "the hospital was 'out' of right hand spica splints."  (Id. at 5.)  She attributes this perceived shortage to the negligence of what she presumes to be the "active duty military employees" "responsible for maintaining proper medical supplies."  (Id.)  Moser also alleges, more broadly, that the United States is liable for military officials' conspiracy to provide substandard on-base care to CHAMPUS beneficiaries in an effort to force

them to convert to an alternative, "Tri-Care" network of off-base medical facilities and providers.  (Id. at 2-3, 8.)  Last but not least, Moser claims FTCA damages against the United States on an employment theory, alleging that her husband injured her wrist in an abusive rage triggered by his "unrelenting hostile work environment" at the Navy's Balboa base.  (Id. at 3-4, 9, 12-14.)  She contends that the United States – through the actions of her former husband's Naval superiors – "intentionally created" not only this hostile work environment, "but also a hostile *home* environment" resulting in injury to herself and her children.  (Id. at 4 (emphasis added).)

On reply, the United States contends that Moser's alternative theories are not properly before this Court because Moser has not administratively exhausted them as the FTCA requires. (Doc. #63 at 1-3.)  It also challenges the predicate facts underlying Moser's negligent hiring, negligent retention, and procurement theories.  (Id. at 4-7.)

For the reasons below, the Court agrees with the United States that Moser has not met her burden of demonstrating federal jurisdiction over any of her FTCA claims, and that her case should therefore be **DISMISSED** for lack of jurisdiction pursuant to Federal Rule 12(b)(1).

### A. FTCA Jurisdiction over Moser's Malpractice Claim

Because the United States is presumptively immune from suit, the Court has jurisdiction over cases against the federal government only to the extent Congress has consented to be sued in the circumstances at hand.  Federal Deposit Ins. Corp. v. Meyer, 510 U.S. 471, 475 (1994) Statutory waivers of federal sovereign immunity are strictly construed, with ambiguities traditionally resolved in the United States' favor.  United States v. Nordic Village, 503 U.S. 30, 33 (1992); Place v. Weinberger, 497 F.2d 412, 414 (6th Cir. 1974).

10

The FTCA operates as a "limited waiver of sovereign immunity, making the [United States] liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment."  United States v. Orleans, 425 U.S. 807, 813 (1976); see also Meyer, 510 U.S. at 475-76.  It provides in relevant part:

> [T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on or after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).  For FTCA purposes,

> "Federal agency" includes the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, *but does not include any contractor with the United States*.

> "Employee of the government" includes (1) officers or employees of any federal agency, members of the military or naval forces[11] of the United States . . . and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation [. . . .]

28 U.S.C. § 2671 (emphasis added).  By its plain language, therefore, the FTCA does not waive the United States' immunity to suit for the torts of the federal government's independent contractors, and the FTCA does not grant this Court subject matter jurisdiction over actions arising from those contractors' torts.  Orleans, 425 U.S. at 813-14; Linkous v. United States, 142 F.3d 271, 275 (5th Cir. 1998).

A critical factor distinguishing federal contractors from federal employees, for FTCA

---

[11] A naval member acts "within the scope of his office or employment," for purposes of the United States' FTCA liability for that member's torts, when "acting in the line of duty."  Id.

11

purposes, is the "absence of authority . . . to control the physical conduct of [a] contractor in performance of the contract." Logue v. United States, 412 U.S. 521, 527-28 (1973); see also Orleans, 425 U.S. at 814.  Courts may consider additional factors in distinguishing contractors from employees.  See,e.g., Linkous, 142 F.3d at 275-76; Broussard v. United States, 989 F.2d 171, 175 (5th Cir. 1993); Robb v. United States, 80 F.3d 884, 888-89 (4th Cir. 1996).  However, a number of courts – including several sister Circuits – have found the "control" factor decisive where the United States' power to direct or supervise a physician's medical care at a federal medical facility is expressly limited by the terms of an agreement (or agreements) between that physician and the facility.  See, e.g., Broussard, 989 F.2d at 175-76; Lurch v. United States, 719 F.2d 333, 337-38 (10th Cir. 1983).  In such cases, it is the primary contract terms governing a physician's provision of medical services that typically determine whether the United States may be held liable for that physician's malpractice.  See, e.g., Wood v. Standard Prods. Co., 671 F.2d 825, 829, 832 (4th Cir. 1982); Lurch, 719 F.2d at 337-38; Broussard, 989 F.2d at 176.

The United States asserts that under the plain language of the three contracts described at Part I.A.2, supra – and regardless of whether this Court considers factors beyond Balboa's "control" of Morgan – Morgan acted as an independent contractor when he examined Moser's wrist in August 1996.  (See doc. #48 at 10-14.)  Moser responds that while the wording of these contracts "lends some credence" to the United States' position, there is also evidence of "the government's power to have exercised its right to manage the daily decision making of Dr. Morgan."  (Doc. #51 at 6-7.)  She notes that under his contract with Gatewood, Morgan's "services and the manner of providing them are under the supervision of [Balboa] medical staff.'"  (Id. at 6-7 (emphasis added) (citing doc. #48 Ex. 3 at 2).)  Moser also points to

12

provisions requiring subcontractors to comply with Balboa audits and credentialing standards,

empowering Balboa to terminate contract medical providers essentially at will, and prohibiting

contractor "interference with the care or treatment given or prescribed to any patient of

[Balboa]."  (Id. at 6-7 (citing in part doc. # 48 Ex. 1 at 18 and Ex. 2 at 3, 6, 8.)  Moser further

notes that Balboa furnished supplies, facilities, and billing assistance to contract physicians,

while maintaining its own patient records and relationships.  (Id. at 7.)  She concludes that these

features show Balboa had a "right to manage the daily decision making of [Morgan]" and that

there is thus "room for this Court to find" that Morgan acted as a government employee for

FTCA purposes.  (Id.)

Upon review of the record and relevant case law, the Court agrees with the United States

that Morgan acted as an independent contractor in examining and treating Moser on August 31,

1996.  As a threshold matter, all three of the contracts linking Morgan to Balboa contain express

declarations of intent to forge independent contract, as opposed to employment, relationships.

The "Independent Contractor Physician Agreement" between Morgan and Gatewood, Balboa's

second-party contractor, states that Morgan will provide medical services to Balboa "as an

independent contractor" of Gatewood.  (Doc. #48 Ex. 3 at 1, 4-5.)  Gatewood's "Resource

Sharing Contract" with Foundation, the first-party contractor, provides that

> None of the provisions of this Contract are intended to create nor shall they be
> construed to create any relationship between [Foundation] and [Gatewood] other
> than that of independent entities contracting with each other hereunder solely for
> the purpose of effecting the provisions of this Contract.  Nor shall this Contract be
> construed to create any relationship between [Gatewood] and [Balboa].  None of
> the parties hereto nor any of their respective officers, agents or employees shall be
> construed to be [sic] officer, agent or employee of the other.

(Doc. #48 Ex. 2 at 1; see also id. at 3 (describing "intent of the parties that the legal status of

[Gatewood] shall at all times be that of an independent contractor).)  Finally, Foundation's "Resource Sharing Agreement" with Balboa states:

> None of the provisions of this Agreement are intended to create, nor shall be deemed or construed to create, any relationship among [Foundation], [Balboa] or the health care personnel provided hereunder other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement and of health care personnel supplied hereunder, nor any of their respective employers, agents, or employees, shall be construed to be the agent, servant, employee or representative of any other party.

(Doc. #48 Ex. 1 at 8.)[12]

The provisions of each agreement requiring contractor personnel to maintain their own professional liability insurance coverage, provide services on a lump-sum or fee rather than wage basis, notify patients of their contractor status, and relinquish patient records upon contract termination reinforce the notion of an arms'-length relationship between Balboa and providers like Morgan.  (Doc. #48 Ex. 1 at 4, 9; Ex. 2 at 4-5; Ex. 3 at 2-7; see also, e.g., Broussard, 989 F.2d at 176 (insurance and fees) and Robb, 80 F.3d at 894 (patient records).)  As Moser observes in her papers, however, there are other contract provisions that could indicate a closer relationship.  For instance, contract medical providers are expected to treat patients in Balboa's clinical space and are subject to many of the same credentialing, training, patient care, and billing standards as medical providers directly employed by the Navy.  (Doc. #48 Ex. 1 at 1-2, 6-8; Ex. 2 at 5-7; Ex. 3 at 1-2, 5-7.)

This Court is not aware of any recent, mandatory authority on the application of the

---

[12] The Agreement also refers to the health care personnel to be supplied to Balboa as "contractor[s]" and "contract personnel."  (See, e.g., id. at 9.)  It further provides that Balboa is to "retain[] no control over professional aspects of the services rendered" by contract personnel.  (Id. at 2.)  Analogous provisions appear in the Resource Sharing Contract and Independent Contractor Physician Agreement.  (See doc. #48 Ex. 3 at 10; doc. #48 Ex. 2 at 3.)

FTCA to individuals providing medical services at military facilities pursuant to contracts with the United States or federal contractors or subcontractors.[13] However, sister
Circuits addressing the question appear to have been virtually "unanimous in holding that a contract physician is not an employee of the government under the FTCA." Carrillo v. United States, 5 F.3d 1302, 1304 (9th Cir. 1993) (internal citations omitted) (collecting cases from Second, Fourth, Eighth and Tenth Circuits); see also Broussard, 939 F.2d at 176 (Fifth Circuit) and Linkous, 142 F.3d at 277 (same). Many have so held despite provisions binding contract physicians to the same facility-wide standards as physicians employed directly by the facility, reasoning that this sort of "general regulation" – even where it appears "pervasive" – does not void a physician's independent contractor status. Lurch, 719 F.2d at 338 n. 9 (citing Orleans, 427 U.S. at 817-18) (scheduling requirements and termination standards); see also Linkous, 142 F.3d at 276 (scheduling, billing and patient notification requirements); Robb, 80 F.3d at 892-93 (qualification and performance reviews). In light of this authority, the Court is persuaded that the contract provisions applying Balboa's standard credentialing and record keeping requirements to Morgan, providing for Morgan's use of Balboa's patient care facilities, reserving the right to terminate Morgan's treatment privileges, and generally providing for "supervision" of Morgan's services should not – contrary to Moser's contentions – render Morgan a federal employee under the FTCA. (See doc. #51 at 5-6.)

---

[13] The Court has located two unpublished Sixth Circuit opinions from the 1990s, both declaring the individuals in question to be independent contractors, rather than federal employees, for FTCA purposes. See Durbin v. United States, No. 92-6658, 1993 WL 219868 (6th Cir. June 21, 1993); Richerson v. United States, No. 95-2391, 1996 WL 733136 (6th Cir. Dec. 18, 1996). Neither opinion includes detailed analysis, and one grounds its immunity finding in Michigan state law. See Richerson, 1996 WL 733136 at *2-3.

Because the clear terms of the three contracts linking Morgan and Balboa place Morgan well "outside the parameters of an employer-employee relationship with the Government," see Lurch, 719 F.2d at 337-38, the FTCA does not waive the United States' immunity to suit for Morgan's alleged malpractice.[14]  Moser's malpractice claim must therefore be dismissed under Federal Rule 12(b)(1) unless – as Moser contends – the United States is equitably estopped from contesting Morgan's employment status in the circumstances of this case.  The Court next addresses, and rejects, Moser's estoppel claim.

### B.    Equitable Estoppel

To estop the United States from relying on Morgan's independent contractor status to defeat jurisdiction, Moser must show that the United States affirmatively misrepresented some material fact or issue and that she reasonably relied on that misrepresentation to her detriment. Michigan Express, Inc. v. United States, 374 F.3d 424, 427 (6th Cir. 2004).  Because misrepresentation arising from "mere negligence" will not support an estoppel claim against the government, Moser must show that the United States, through its agents, engaged in "affirmative misconduct" by "either intentionally or recklessly" misleading her.  Id. (internal citation omitted).

---

[14] Because Morgan's independent contractor status – and, by extension, the United States' immunity to this suit – is so evident from the face of the cited contracts, the Court need not determine whether a "strict" or "modified" (or multifactor) control test is the governing standard in this Circuit.  See, e.g., Lurch at 719 F.3d at 337-38.  In any event, the Court is satisfied that Morgan would qualify as an independent contractor even under the modified control test.  See, e.g., Linkous, 142 F.3d 276-77 (multifactor analysis finding that physician who provided onsite, fee-for-service care to CHAMPUS beneficiaries at Army hospital, pursuant to a direct contract with hospital that limited hospital's control of physician's professional judgment and physical job performance, acted as independent contractor for purposes of FTCA malpractice suit).

16

Moser contends the Navy acted in "bad faith" by allowing her to be treated by Morgan under circumstances that gave her "absolutely no reason to suspect" he was not a military officer and employee, and then failing to affirmatively disclose Morgan's civilian contractor status in its initial response to her administrative malpractice claim. (Doc. #51 at 8-9.) With respect to her treatment, Moser avers that she had seen military doctors at Balboa working in civilian clothing and had observed at least one such doctor wearing a white lab coat "identical" to the one Morgan wore during her August 1996 visit. (Id. at 8-9.) Moser also avers that Morgan did not ask her to sign a waiver acknowledging his civilian contractor status or display an identification badge indicating that status, both express requirements of the contracts governing Morgan's services at Balboa. (Id. (citing doc. #51 Ex. A and doc. #48 Ex. 1 at 9, Ex. 2 at 12).) Moser further observes that Balboa was an on-base facility accessible only to those displaying a "base decal and/or military identification," and notes that she had refused to enroll in the Navy's Tri-Care Prime health plan – apparently then being phased in as a CHAMPUS alternative – because Tri-Care "would have required her to accept treatment from civilians off-base." (Id. at 2-3 and 8 (citing in part doc. #51 Ex. A (Moser Aff.).) Moser argues that these facts show the Navy failed to enforce its own uniform and identification rules for both active-duty and contract personnel at Balboa, and by extension or implication "painstakingly shielded the identity of Dr. Morgan and others to hold them immune from any [malpractice] liability . . . ." (Id. at 9.)

With respect to her administrative malpractice claim, Moser observes that the Navy's initial May 1999 response to her claim "did not affirmatively state that [Morgan] was a contractor," suggesting only that he "may have been." (Id. at 10.) She also notes that while the Navy stated it would "endeavor to identify any contractors" who treated her at Balboa, it also

17

warned that this process "may take a long time or may be incomplete" and that it would be "incumbent upon [Morgan] to determine the liability" of any such party and "bring the appropriate legal action within the applicable statutes of limitations."  (Id.; doc. #48 Ex. 7 at 2).) Moser suggests that these statements improperly shifted the discovery burden to her, particularly in light of the fact that the "information [she] sought was solely within the control" of the United States.  (Id. at 11.) Moser further notes that the United States did not issue its final denial of her administrative claim until November 2001 – "less than a month before the statute of limitations would run" – and that even the denial "did not identify Dr. Morgan fully, but merely identified who he was contracted through."  (Id.)  Moser concludes that the United States "bent over backwards to conceal Dr. Morgan's identity from [her] until such time as it supposed that she would be factually estopped from being able to pursue her claim due to the impending statute of limitations, which by its own words, it was aware of."  (Id.)

The United States does not challenge the factual content of Moser's estoppel allegations, reasoning instead that those allegations – even if true – do not show the Navy engaged in the sort of "affirmative misconduct"[15] necessary to support an estoppel claim against the United States. (Doc. #48 at 15.)  The Court agrees, and concludes that the United States may not be equitably estopped from relying on Morgan's status as an independent contractor to insulate itself from liability.  Moser's account of her August 1996 visit to Balboa – if true – strongly supports her

_____

[15] The United States also contends that Moser's allegations do not establish even the "traditional elements of estoppel," which would require Moser to show she relied on a *negligent* misrepresentation to her detriment.  (Id.; see also Michigan Express, 374 F.3d at 427 (describing traditional test).)  Because the Court agrees with the United States that estoppel claims against the United States require a heightened showing of "affirmative misconduct," it need not decide whether Moser has established estoppel under the more relaxed traditional test.

claim that it was reasonable for her to assume Morgan was a military, rather than civilian, doctor.  But Moser's allegations – even if true – fall short of establishing that the Navy did anything to affirmatively encourage her misperception.  Even if the Navy failed to enforce uniform and identification requirements for Balboa's military and civilian doctors or otherwise ensure that patients treated by civilians were put on notice of that fact, there is no evidence that these failures were rooted in any motive to obscure the doctors' status or (by extension) make it more difficult for patients to identify tortious doctors as contractors in time to sue them.[16]  Indeed, other courts construing similar facts have rejected the notion that a military hospital's failure to enforce separate uniform and identification requirements for military and civilian doctors, or maintain other "observable differences" between the groups, rises to the level of "affirmative misconduct."  Lurch, 719 F.2d at 340-41; Linkous, 142 F.3d at 278.  Nor does "requiring CHAMPUS beneficiaries to seek medical services at military facilities," or creating other circumstances that might lead patients to "incorrectly assume" they are being treated by military employees, constitute "affirmative misconduct."  Linkous, 142 F.3d at 278.

The record of Moser's administrative claims process is similarly devoid of any evidence of bad-faith, affirmative misconduct by the Navy.  While it is undisputed that the Navy took over two years to investigate and formally deny Moser's claim, in part based on its finding of

_____

[16] Nor is there any apparent reason to assume that the Navy would be so motivated.  As Moser concedes in passing, Balboa required contract physicians like Morgan to maintain their own malpractice insurance.  (See doc. #51 at 9 and contract survey at Part III.A, supra.)  Because the Navy does not bear the costs of successful private malpractice suits against contractor physicians, it has no apparent financial incentive to obscure those physicians' civilian status until the statute of limitations has run on such suits.  If anything, it would seem the Navy has a financial incentive to discover and reveal physicians' contractor status during the administrative claim phase, rather than wait to establish FTCA immunity in costly civil litigation.

Morgan's independent contractor status, it is also true that the Navy issued an initial response to Moser within two weeks of receiving her claim forms in May 1999.  (See doc. #48 Exs. 6, 7.)  Moser faults this initial response for not *confirming* that Morgan acted as an independent contractor when he treated Moser's wrist in August 1996.  However, Moser cannot reasonably contend that the response was drafted to *mislead* her as to Morgan's employment status or its implications for the statute of limitations on her claims; if anything, it appears the response was drafted to *alert* Moser to those very issues.  In the very first paragraph of its response, the Navy advises Moser to "please be aware that our position will likely be that the statute of limitations ran on this claim."  (Doc. #48 Ex. 7 at 1.)  The response also raises the issue of Morgan's employment status as it bears on the statute of limitations, noting the Navy's presumption that Moser is "not claiming that a government employee did something to cause the fracture" and cautioning that if contractors are found at fault, this may affect the applicable statute of limitations.  (Id. at 1-2.)

    With respect to the Navy's final letter formally denying Moser's administrative malpractice claim, Moser concedes that her counsel received the denial letter several weeks before the statute of limitations ran on her putative private tort claim against Morgan.  (See doc. #51 at 11 and doc. #63 Ex. 1.)  Moreover, while Moser asserts that the letter does not "fully" identify Morgan, she cannot dispute that the letter lists Morgan's name and title and provides an address and telephone number for one of Morgan's contract affiliates.  (See doc. #63 Ex. 1)

    Taken as a whole, the current record of the administrative claims process strongly suggests that – if anything – the Navy exceeded its good-faith disclosure obligations in processing Moser's claim.  While it is entirely possible that the Navy could have worded its

20

initial response letter to Moser more carefully, expedited its investigation of Moser's claim, or provided more information on Morgan in its final denial letter, the Court must be mindful of the Supreme Court's caution that "punishing the good-faith and conscientious efforts of the government by an easy rule of estoppel might create not more reliable advice," but rather "less advice" to administrative claimants and potential tort litigants.  <u>Michigan Express</u>, 374 F.3d at 427-28.  Because Moser has not produced any evidence that the Navy engaged in "affirmative misconduct" with respect to Morgan's independent contractor status, the United States cannot be equitably estopped from asserting that status to immunize itself from Moser's malpractice claim.[17]  Moser's FTCA malpractice claim against the United States is therefore **DISMISSED**.

### C.      FTCA Jurisdiction over Moser's Other Claims

The United States' 12(b)(1) motion, and Moser's opposition to that motion, focus largely

---

[17] Because Moser has not shown "affirmative misconduct," the Court need not reach the other elements of the estoppel test.  In any event, it is far from clear that Moser *could* satisfy the other estoppel elements.  With respect to detrimental reliance, Moser suggests she would have sought follow-up care for her wrist sooner had she been aware of Morgan's independent contractor status.   (<u>See</u> doc. #51 at 3.)  She explains that she would not have been as shocked to see such "rude and abrasive" behavior in a civilian doctor, and therefore would have been less likely to be discouraged from seeking follow-up treatment after observing it.  (<u>Id</u>.)  It is not entirely plausible to the Court, however, that this lessened "shock" value would have outweighed Moser's apparently deep and generalized distrust of civilian doctors.  (<u>See id</u>. at 2-3.)  If anything, it seems Morgan's conduct – if coupled with an awareness of his civilian status – would have reinforced Moser's already poor opinion of civilian doctors and further discouraged her from returning to Balboa for timely follow-up treatment.  Moser also suggests that if the Navy had notified her of Morgan's independent contractor status sooner, she would not have lost the opportunity to seek damages from Morgan in a private tort suit.  (<u>Id</u>. at 11.)  However, it is undisputed that the Navy put Moser (or least at her counsel) on notice that Morgan *might* be an independent contractor over two years before the private statute ran, and also confirmed that Morgan was in fact a contractor when Moser had several weeks left in which to file a claim.  In short, because Moser has not clearly indicated what she "would have done *differently* had she known" Morgan was a contractor before November 2001, it is unclear she could establish the requisite element of detrimental reliance on any "affirmative misconduct" by the Navy.  <u>See</u> <u>Linkous</u>, 142 F.2d at 278 (emphasis added).

on the FTCA malpractice claim discussed and dismissed above. However, Moser's opposition and FAC purport to raise other related claims against the United States, and her FAC names "John Doe" defendants. (See Part I.B, and introduction to Part III, supra.) The Court must therefore consider whether it should dismiss Moser's case in its entirety or instead retain jurisdiction over some or all of these residual claims.

### 1.    Moser's Other FTCA Claims Against the United States

Moser's opposition to the United States' 12(b)(1) motion, while focused on her FTCA malpractice allegations, appears to assert several other, peripherally related FTCA[18] claims against the United States.[19] (See introduction to Part III, supra.) The United States contends on reply that none of these additional claims are properly before the Court because Moser has not administratively presented them under the FTCA. (Doc. #63 at 2-4.) Again, the United States' position is well taken. The FTCA provides that

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section.

---

[18] While it is conceivable that some of these additional claims could arise under some other federal law, Moser's opposition and FAC repeatedly – and exclusively – reference the FTCA. The Court therefore regards the claims as arising under the FTCA for purposes of its jurisdictional analysis.

[19] It is not entirely clear, from Moser's opposition, whether these additional claims are also lodged against the "John Doe" defendants as well as the United States. In any event, as discussed below, the Court lacks jurisdiction over the claims because they are administratively unexhausted. See discussion at note 21, infra.

22

28 U.S.C. § 2675(a).  Because the FTCA's administrative claims procedure is mandatory, the

Court lacks jurisdiction to entertain any claims not first presented to the Navy.  See Executive Jet

Aviation, Inc. v. United States, 507 F.2d 508, 514-15 (6th Cir. 1974).  Moser's May 1999 "Form

95" submission to Naval Legal Services states, in relevant part:

> My claim arises out of the failure of the Balboa Naval Medical Facility to
> properly diagnose and treat a fracture in my right wrist on 31 August 1996.  This
> fracture was not diagnosed until December of 1998.  This has created much
> discomfort and hardship for me.
>
> [ * * * * ]
>
> Injuries are still accruing, but include excessive pain for over two years and either
> temporary or permanent loss of ability in the limb.  Injury also includes emotive
> distress due to verbal treatment by medical personnel at the time of injury.

(Doc. #48, Ex. 6 at 2, 1.)  As drafted, this claim put the Navy on notice of only Moser's primary

malpractice allegations against Morgan and Balboa.[20]  See, e.g., Douglas v. United States, 658

F.2d 445, 447 (6th Cir. 1981) (requiring, under 28 U.S.C. § 2675, "written notice .. sufficient to

enable the agency to investigate" a claim).  Moser's remaining FTCA claims against the United

States are accordingly **DISMISSED** for lack of jurisdiction.[21]

---

[20] While it is possible that Moser lodged other relevant administrative claims with the
United States, her FAC refers only to this May 1999 Form 95 and to a second Form 95 –
presumably listing substantively identical claims – Moser avers she submitted directly to Balboa
in August 1999.  See supra note 7.  The record does not contain a copy of Moser's August 1999
Form 95, see id., and is devoid of references to any other administrative claims.

[21] Where it appears that a plaintiff could cure the jurisdictional flaws in her case through
timely amendment of her complaint, the Court may grant the plaintiff leave to amend in lieu of
dismissing the complaint for lack of jurisdiction.  See, e.g., American Fed. of Gov't. Employees
v. Stone, No. 3:03-cv-355, 2005 WL 1620402, at *5 (S.D. Ohio July 6, 2005).  Leave to amend
need not be granted, however, where a proposed amendment would add or expand claims that
are not expected to survive a motion to dismiss.  See, e.g., Wade v. Knoxville Util. Bd., 259 F.3d
452, 459-60 (6th Cir. 2001); Foman v. Davis, 371 U.S. 178, 182 (1962) (futility exception to
general rule that courts should freely grant leave to amend).  Because the Court cannot entertain

### 2. Moser's "John Doe" Claims

The parties' papers on the United States' 12(b)(1) motion do not directly address the question of whether Moser's claims against the "John Doe" defendants may survive the dismissal of Moser's claims against the United States. Moser suggests, however, that the Court should not dismiss her "John Doe" claims for lack of jurisdiction because the United States' motion turns on Morgan's status as an independent contractor and the United States has not "shown that the other persons at issue in [the FAC] were anything other than government employees . . . ." (Doc. #51 at 1.) This argument obscures the fact that it is *Moser* – and not the United States – who bears the initial burden of proof on subject matter jurisdiction. See Part II, supra. Moser speculates throughout her papers that any number of military employees – Balboa hospital staff, procurement personnel, military healthcare managers, or her husband's supervising officers – may bear some responsibility for her wrist injury. (See Part I.B and introduction to Part III, supra.) However, Moser does not identify any such employees or submit any other evidence to support her assertions. Because Moser has not set forth any concrete facts indicating that her "John Doe" defendants – if any – *were* government employees, and there is no indication that any such evidence exists, the Court cannot reasonably retain jurisdiction over

---

Moser's unexhausted FTCA claims until those claims have been administratively reviewed by the Navy, and it appears that any administrative review Moser initiated today would itself be untimely under the FTCA, amendment would be futile here. See 28 U.S.C. § 2401(b) ("A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.").

Moser's "John Doe" claims at this time.[22]  The claims are therefore **DISMISSED**.

## IV.    CONCLUSION

For the reasons above, the United States' Motion to Dismiss for Lack of Subject Matter Jurisdiction (doc. #48) is **GRANTED**; Plaintiff Devon Moser's claims against the United States and the "John Doe" Defendants are **DISMISSED WITHOUT PREJUDICE** in their entirety; and Moser's case is **CLOSED**.

IT IS SO ORDERED.

_____s/Susan J. Dlott_____
Susan J. Dlott
United States District Judge

---

[22] If Moser has or can produce evidence linking her injuries to the actions of any specific government employees, she may attempt to overcome this 12(b)(1) dismissal by appropriately amending and re-filing her complaint.  See, e.g., Broussard v. United States, 989 F.2d 171, 177 (5th Cir. 1993) (contrasting effects of Rule 12(b)(1) dismissal for lack of subject matter jurisdiction and Rule 56 grant of summary judgment).